## OAKLAND CLUB v. SOUTH CAROLINA PUBLIC SERVICE AUTHORITY.
### No. 4583.

Circuit Court of Appeals, Fourth Circuit.
March 11, 1940.

Augustine T. Smythe, of Charleston, S. C. (S. Henry Edmunds, of Charleston, S. C., on the brief), for appellant.

Lionel K. Legge, of Charleston, S. C., and R. M. Jefferies, of Walterboro, S. C. (William M. Wilson and Legge & Gibbs, all of Charleston, S. C., on the brief), for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

The South Carolina Public Service Authority (defendant-appellee, hereinafter called the condemnor) is a corporation and instrumentality of the State of South Carolina, was created by, and exists under, its laws. The Oakland Club (plaintiff-appellant in this civil action, hereinafter called the condemnee) is a private corporation, also created by, and existing under, the laws of the State of South Carolina.

On October 3, 1939, the condemnor served upon the condemnee notice, under the provisions of an Act of the General Assembly of South Carolina, approved May 31, 1939, 41 St. at Large, p. 265 (hereinafter called the Eminent Domain Act) and also under Section 21 of the Federal Power Act (U.S.C.A., Title 16, Section 814), that the condemnor intended to condemn and take in fee simple certain lands of the condemnee alleged to be necessary for the public purposes of the condemnor. The notice (according to the provisions of the Eminent Domain Act) named a referee on behalf of the condemnor and required the condemnee to appoint a referee on its behalf and to file such appointment with the Clerk of the United States District Court for the Eastern District of South Carolina within ten days thereafter. The condemnee thereupon brought this civil action in this same Federal Court to enjoin these condemnation proceedings on grounds hereinafter set forth. And condemnee, reserving its rights fully, thereafter nominated its referee and the two referees so nominated appointed a third referee. Later, a second notice of condemnation specifying certain other lands and hunting rights sought to be condemned, was served upon the condemnee by the condemnor; and, by agreement between the parties but with full reservation of condemnee's rights, the condemnation proceedings under both notices were consolidated and conducted in the Federal Court as one. After certain preliminary proceedings, which we need not notice here, the cause on the civil action asking for an injunction was heard on the merits by the District Judge and, on November 17, 1939, an order was entered in the District Court denying the prayer for injunction and dismissing this action. From this order, an appeal has been taken to this Court.

The condemnor (appellee) also filed in this Court a motion to dismiss the appeal, together with certain affidavits and a brief in support of this motion. We prefer to dispose of this case on the merits, and since further our decision is in favor of the condemnor (appellee), this motion to dismiss the appeal is overruled.

The condemnation proceeding here was instituted under the Federal Power Act, under which the condemnor was a licensee, and under which the licensee was given the right to exercise the right of eminent domain by proceeding, either in the United States District Court for the District in which the land or other property sought to be condemned might be located, or in a court of the state in the jurisdiction of which such land or other property might lie. Since the condemnor and condemnee were both corporations (citizens) of the State of South Carolina, the only basis for the jurisdiction of the Federal Court in the condemnation proceedings was under the Federal Power Act. The condemnor, however, elected to proceed in the Federal Court to acquire its rights under the provisions of the Eminent Domain Act of the State of South Carolina.

The complaint of the condemnee which sought the injunction in question set forth two separate grounds:

First: The Eminent Domain Act of the State of South Carolina (which must be followed in the condemnation proceedings) is violative of the Fourteenth Amendment to the United States Constitution in that it provides for the taking of the property of the condemnee, which is private property, for public use, without due process of law and without just compensation, for the reason that this Act does not make reasonable, certain and adequate provision for securing unto the condemnee, before the possession to the condemnee is disturbed by the condemnor, just compensation.

Second: The condemnor has no right or power under the Federal Power Act (under the authority of which the condemnor has undertaken to bring the condemnation proceedings) to take by condemnation (as it here undertakes to do) a fee simple title to any property save an unimproved dam site, and as to the other property which it has undertaken to condemn for the purpose of acquiring a fee simple title, it can take only the right to use or damage the same.

Section 21 of the Federal Power Act reads as follows: "When any licensee can not acquire by contract or pledges an unimproved dam site or the right to

use or damage the lands or property of others necessary to the construction, maintenance, or operation of any dam, reservoir, diversion structure, or the works appurtenant or accessory thereto, in conjunction with an improvement which in the judgment of the commission is desirable and justified in the public interest for the purpose of improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such land or other property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: Provided, That United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000."

■■■ We treat the second of these grounds first. The condemnee strenuously contends that under this provision of the Federal Power Act the condemnor is strictly limited to the rights and powers of eminent domain specifically set out in this Section of the Power Act and that the condemnor, invoking the jurisdiction of the Federal Court under this Section of the Federal Power Act, cannot avail itself of the powers and privileges of eminent domain set out in the Eminent Domain Act of the State of South Carolina, which are considerably broader than those powers and rights of eminent domain specifically mentioned in the Federal Power Act. If this contention be true (we think it is not), the condemnee contends for a very restricted interpretation and definition of the term "dam site" as used in the Federal Power Act. We do not think it necessary to pass upon the condemnee's contention as to the meaning of the term "dam site" in the Federal Power Act, since we are satisfied that the Federal Power Act does not restrict the condemnor to the rights and powers of eminent domain specifically enumerated in the Federal Power Act. We think, under this Act, that the condemnor has an election to exercise the power of eminent domain either under the specified enumerations of the Federal Power Act or under the broader provisions of the Eminent Domain Act of the State of South Carolina.

In his opinion in this case, in the District Court, 30 F.Supp. 334, 341, Judge Myers said: "Looking at the two statutes together, I construe Section 21 of the Federal Power Act not as an exclusive law of eminent domain, not as abridging substantive rights granted to the defendant under the State law, but as complementary to the State law, and as enabling the holder of a Federal Power license to exercise in the Federal courts, as the defendant is doing, the substantive rights of eminent domain granted to it under the State law."

We approve this statement by the learned Judge below. The avowed purpose, the history and the philosophy of the Federal Power Act, we think, all seem to confirm this view. The Federal Power Act came to fulfill, not to destroy. It is a remedial statute enacted by the Federal Congress to extend the rights of eminent domain in favor of licensees under the Act. And in statutes of this character, the great dictum of St. Paul: "The letter killeth but the spirit giveth life," seems peculiarly applicable. Again, a careful reading of the Federal Power Act convinces us that it could not have been enacted by the Federal Congress with the idea that it is, in itself, a complete Statute of Eminent Domain. The statute, in connection with eminent domain, is too brief and leaves too many gaps. Had Congress intended this Statute as a complete statute of eminent domain, which would serve to exclude the rights of the condemnor under a state law, we are convinced that this Statute would have been far more complete and would have included many provisions which are omitted.

The Federal Power Act expressly gives to the licensee the right to proceed, either in a Federal District Court or in a court of the state in which the land, or other property sought to be condemned, is located. Again, the Federal Power Act expressly prescribes for conformity, should the condemnor elect to proceed in a federal court, to the practice and procedure in similar proceedings in the courts of the state in which the property is situated. While the Federal Power Act does not expressly give to the condemnor the privileges of eminent domain under the State law, we think that the provisions of this,

Act just set out quite clearly imply such an interpretation. Any other holding would rob the Act of a measure of consistency which the Federal Congress must have desired to give to this Act.

These views appear to be in line with the decisions in Grand River Dam Authority v. Going, D.C.Okla.1939, 29 F.Supp. 316; Harris v. Central Nebraska Public Power and Irrigation Dist., D.C.Neb.1938, 29 F. Supp. 425; United States v. Bouchard, 2 Cir., 1933, 64 F.2d 482; and (though this case is not directly in point and so was not cited by counsel) the opinion of the United States Supreme Court in Henry Ford & Son, Inc. v. Little Falls Fibre Company, 1930, 280 U.S. 369, 50 S.Ct. 140, 74 L.Ed. 483 appears to squint in the same direction.

■ The condemnee (for his first ground) contends that the South Carolina Statute of Eminent Domain violates the Fifth and Fourteenth Amendments to the Constitution of the United States, evidently on the ground that the Statute permits private property to be taken for public use without just compensation. The deficiency of the Statute and its consequent unconstitutionality, it is explained, lie in the provision for the finality of the jury verdict as to damages without a reasonable, certain and adequate provision to secure the payment of these damages to the condemnee. More particularly, in permitting the condemnor to enter upon and use the land upon payment or deposit by the condemnor of the amount awarded by the referees, the Statute (it is claimed) does not provide adequate security to the condemnee for the payment by the condemnor of the amount of damages which may be assessed in the probable verdict of the jury.

Manifestly, an "owner is entitled to reasonable, certain, and adequate provision for obtaining compensation before his occupancy is disturbed." Cherokee Nation v. Southern Kansas Ry., 1890, 135 U.S. 641, 659, 10 S.Ct. 965, 971, 34 L.Ed. 295. Clearly anything less than this would contravene the minimum standards that are implicit in the guarantees of the Federal Constitution. However, after a comparison with various condemnation statutes considered by the United States Supreme Court, we think that the requisite certainty and the necessary security of compensation are quite definitely provided under the terms of the South Carolina Statute of Eminent Domain.

In a leading condemnation case, Cherokee Nation v. Southern Kansas Ry., supra, the Supreme Court upheld a federal statute which provided that the condemnor might enter upon the property upon the deposit by the condemnor of double the amount of the referees' award. There, as here, a provision granted the right of a trial de novo of the quantum of damages, if appeal were taken from the award of the referees. True it is that in the Cherokee Nation case the Statute provided for a deposit (before the condemnor could enter into possession) of *double* the amount of the award of the referees, while the instant South Carolina Statute provided for a deposit of only the exact amount of the award of the referees. But we see nothing in the language of the opinion in the Cherokee Nation case to indicate that a deposit by the condemnor of *double* the amount of the award of the referees is *essential* to satisfy the provision of the Fourteenth Amendment to the Constitution of the United States as to "due process". The Statute considered in the Cherokee Nation case went beyond the minimum safeguards required by this amendment; the South Carolina Statute adequately satisfies those safeguards. As was clearly indicated in the opinion of the trial judge in the instant case in the court below 30 F.Supp. 334, 339: "There is, in the first place, no legal presumption that the verdict of the jury on appeal will exceed the amount of the referees' award. The Act itself negatives such presumption by provision for return to condemnor of excess award, in the event that the jury's finding be for a less amount." Yet even should the amount fixed by the jury exceed the amount found by the referees, the condemnee's equitable lien on the property and its retention of legal title to the property until the payment by the condemnor of the amount set in the jury's verdict afford ample and adequate protection to the condemnee.

In Sweet v. Rechel, 1895, 159 U.S. 380, 16 S.Ct. 43, 40 L.Ed. 188, the constitutional requirement of just compensation, and adequate security as to its receipt by the condemnee, was considered at length and found to be satisfied by a Massachusetts Statute which provided for the regular ascertainment of an owner's damages in a legal mode and gave him an unqualified right to a judgment therefor. This Statute permitted the City of Boston to take title to and commence work upon the property

at once, with leave to the owner thereafter to file a claim to be heard by commissioners, from whose report he could appeal to a court. But in Bauman v. Ross, 1897, 167 U.S. 548, 599, 17 S.Ct. 966, 42 L.Ed. 270, the Court said that the provision, in the federal statute giving the City of Washington power to condemn, which made actual payment of the jury's award a condition precedent to the condemnor's taking possession, meant that title was retained until payment was received, and that this provision properly secured the payment of just compensation to the owners. Of course, this did not establish a rule that payment must precede taking possession; for, as the Court said in Backus v. Fort St. Union Depot Co., 1898, 169 U.S. 557, 568, 18 S.Ct. 445, 449, 42 L.Ed. 853, "there can be no doubt that, if adequate provision for compensation is made, authority may be granted for taking possession, pending inquiry as to the amount which must be paid and before any final determination thereof." Thus, a New York Statute making the state treasury the source of payment and providing for valuation by a board, and review by a court if application were made in two years, was held to provide adequate security for compensation. Adirondack Ry. v. New York, 1900, 176 U.S. 335, 20 S.Ct. 460, 44 L.Ed. 492. Similarly in Williams v. Parker, 1903, 188 U.S. 491, 23 S.Ct. 440, 47 L.Ed. 559, a state statute authorizing the City of Boston to take possession prior to payment was upheld although the liability, but not the solvency, of the city was seriously questioned; and the Court refused to hold that adequate security for compensation must be shown by a formal judgment establishing liability.

In Bragg v. Weaver, 1919, 251 U.S. 57, 40 S.Ct. 62, 64 L.Ed. 135, compensation under a Virginia Statute was to be assessed by viewers, whose award was to be examined by supervisors, and from their decision an owner could appeal to a court for hearing de novo. While the latter opportunity came after the taking, the Court said it was conceded that there was adequate provision for the certain payment of compensation. In Hays v. Port of Seattle, 1920, 251 U.S. 233, 40 S.Ct. 125, 64 L.Ed. 243, the Washington Statute provided for no deposit of money before the taking, but the Court found that a detailed provision by which an owner could sue the State adequately assured payment of compensation without unreasonable delay. Likewise, in Joslin Manufacturing Co.

v. Providence, 1923, 262 U.S. 668, 43 S.Ct. 684, 67 L.Ed. 1167, a provision whereby compensation was to be assessed by a commission or a jury after the taking was considered adequate, because public faith and credit were pledged to payment and an owner could obtain execution against the city. Under this statute, however, title passed to the City at the taking.

It is quite clear that these cases do not even attempt to lay down any precise or mathematically exact standard by which the certainty of a provision to secure payment of compensation to the condemnee may be measured. In Dohany v. Rogers, 1930, 281 U.S. 362, 369, 50 S.Ct. 299, 302, 74 L.Ed. 904, 68 A.L.R. 434, after noting that a provision requiring an owner to surrender possession before payment of compensation is not a denial of due process where payment is insured, the Supreme Court said: "The due process clause does not guarantee to the citizen of a state any particular form or method of state procedure. Under it he may neither claim a right to trial by jury nor a right of appeal. Its requirements are satisfied if he has reasonable notice and reasonable opportunity to be heard and to present his claim or defense; due regard being had to the nature of the proceeding and the character of the rights which may be affected by it." See inter alia Bauman v. Ross, supra, and Backus v. Fort St. Union Depot Co., supra. Accordingly, we hold that the Eminent Domain Act of South Carolina, is constitutional, that it does not take private property without just compensation and does not violate the Fourteenth Amendment of the Federal Constitution. It may be noted that the Fifth Amendment cannot, of course, be contravened by the State Statute, for no restrictions upon the States are imposed by this amendment.

■ Ordinarily there is a strong presumption in favor of the constitutionality of the legislative enactment. See 11 Am. Jur. § 128, for citations. And though the duty to do so in a proper case is beyond question, there is yet obvious delicacy in the finding by a federal court that a State Statute is void as contravening the Constitution, treaties or laws of the United States. And a finding by such a court is indicated only in a very clear case. Every reasonable intendment is presumed against such a course of action. This situation brings to the court (if we may employ the terms of sociological jurists),

a nice problem in the balancing of conflicting interests: the interest, on the one hand, of the State, as declared by its legislature, that the exercise of the power of eminent domain for the presumed good of the public be not blocked by either one or a few unwilling holders of property, and the interest, on the other hand, of a property holder (individual or corporate) in securing just compensation for the property taken. We believe the South Carolina Statute of Eminent Domain makes adequate provision for the realization of both of these interests.

Moreover, in Lexington Water Power Co. v. Wingard, 1929, 150 S.C. 418, 148 S.E. 366, the Supreme Court of South Carolina upheld under the State Constitution condemnation proceedings, provided by another condemnation statute, similar to those here in question. And the provisions of the Eminent Domain Act of South Carolina, it seems to us, embody a great proportion of the elements of statutes sustained by the Federal Supreme Court and afford ample security of compensation. The condemnee is granted an appraisement by a fairly constituted board of referees; he is assured payment or deposit of this award before the condemnor may enter; he is granted a further hearing by a jury, if he chooses, on appeal; and he is assured actual payment of the ultimate amount awarded to him before he need give up his legal title. Cf. Cherokee Nation v. Southern Kansas Ry., supra, 135 U.S. at page 660, 10 S.Ct. 965, 34 L.Ed. 295; Suncrest Lumber Co. v. North Carolina Park Comm., D.C.N.C.1929, 30 F.2d 121, 125. The general law of South Carolina appears, too, to afford to the condemnee the added security of an equitable lien to insure the payment of the compensation duly awarded to it. Also, as the District Court found, the South Carolina Statute of Eminent Domain permits the condemnee to enter judgment upon the jury's verdict, and upon this, it would seem, execution could issue against the condemnor.

■ True, in the Act of April 7, 1934, 38 St. at Large, p. 1507, incorporating the South Carolina Public Service Authority, it is expressly stipulated, §§ 3, 10, 10–A, that the State of South Carolina shall never be in any way obligated or liable for the debts or obligations of the Authority. And we have lent sympathetic ears to counsel's plea that should the project fail and should the condemnee be relegated to the empty remedy of taking back the land, after the Authority has entered and wrought its havoc, condemnee would find itself possessed of an abomination of desolation, useless to it, and an eyesore to all beholders. While some might readily concede the danger of this possibility, one might say of all things, Deo volente, and add as to the instant project only gubernacula volente; nevertheless, the safeguards granted by the instant statutory provisions for the payment of compensation to the condemnee are all that can be constitutionally required.

■ And though the constitutionality of the Act rests upon its own provisions, and is not affected by the condemnor's offer of additional security, yet the condemnee's allegation of irreparable injury does bring before the Court on the question of an injunction the magnitude of the forty million dollar project and the likelihood of condemnor's ability to pay a judgment against it. See Note (1938) 24 Va.L.Rev. 786. Thus, in Suncrest Lumber Co. v. North Carolina Park Comm., supra, where the statute provided that the State should be under no liability for payment of damages, the Court in an opinion by Judge Parker considered the probability of sufficient funds being available and found the condemnee was amply secured by retention of title until payment should be received.

Counsel for the condemnor in this case stressed two other reasons why the injunction in question should not be granted: first, the harm sought to be averted has to a very large extent, already been done so that the remedy of injunction would, under the circumstances, be ineffective; second, under a question of procedure, since the injunction was not granted by the lower court and since further, the condemnee in perfecting this appeal, neither asked for nor received a supersedeas, condemnee is not in a position to ask this Appellate Court to interfere at this time with the decision of the lower Court. Our affirmance of the decision in the lower Court on broad grounds makes it unnecessary for us to pass on these questions.

For the reasons set out above, we affirm the judgment of the District Court.

Affirmed.